**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Chris Snyder,<br>Plaintiff,<br>v.<br>Norfolk Southern Railway Co.,<br>Defendant. | Case No.: 3:23-cv-00059<br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 2

LEGAL STANDARD ........ 4

ARGUMENT ........ 5

I. NORFOLK SOUTHERN EFFECTIVELY CONCEDES THAT THE DIRECT-THREAT FRAMEWORK APPLIES. ........ 6

II. Norfolk Southern Has Not Met Its Burden. ........ 7

A. Norfolk Southern Has Not Submitted Any Evidence Supporting The Reasonableness Of Its Former Medical Director's Purported Belief. ........ 8

B. The Evidence Demonstrate That The Purported Opinion Of Norfolk Southern's Former Medical Director Was Unreasonable. ........ 12

C. Norfolk Southern Has Not Proven That There Was No Reasonable Accommodation That Would Sufficiently Reduce The Risk. ........ 18

III. NORFOLK SOUTHERN'S REMAINING ARGUMENTS USE THE WRONG LEGAL FRAMEWORK TO ANALYZE MISREPRESENTED FACTS, UNSUPPORTED ASSUMPTIONS, AND INFERENCES TO WHICH NORFOLK SOUTHERN IS NOT ENTITLED. ........ 19

B. Snyder Was Subject To An Adverse Action. ........ 21

C. Although Snyder Need Not Prove Pretext, There Is Ample Evidence Of It. ........ 22

D. Snyder's Receipt Of Benefits Is Irrelevant. ........ 23

*1. Wrong In Fact* ........ 23

CONCLUSION ........ 26

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ... 5

*Aubrey v. Koppes*,
975 F.3d 995 (10th Cir. 2020) ... 22

*Bailey v. Metal-Fab, Inc.*,
No. 19-cv1098, 2020 WL 6077315 (D. Kan. Oct. 15, 2020) ... 22

*Bates v. United Parcel Service, Inc.*,
511 F.3d 974 (9th Cir. 2007) ... 6

*Bender v. Norfolk S. Corp.*,
994 F. Supp. 2d 593 (M.D. Pa. 2014) ... 6, 7, 12, 13

*Bragdon v. Abbott,*
524 U.S. 624 (1998) ... 7, 8, 12

*Brewer v. Quaker State Oil Ref. Corp.*,
72 F.3d 326 (3d Cir. 1995) ... 10, 17

*Britting v. Shineski*,
Civ. A. No. 08–1747, 2010 WL 500442 (M.D.Pa. Feb. 5, 2010) ... 12

*Burlington Northern & Santa Fe Railway Co. v. White*,
548 U.S. 53 (2006) ... 21

*Campbell v. Union Pac. R.R. Co.*,
No. 4:18-cv-00522-BLW, 2020 WL 5300734 (D. Idaho Sept. 4, 2020) ... 20

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ... 2

*Cleveland v. Policy Management Sys. Corp.*,
119 S.Ct. 1597 (1999) ... 25

*Coleman v. Pennsylvania State Police*,
561 F. App'x 138 (3d Cir. 2014). ... 21

*Delano v. Abbott Labs.*,
908 F. Supp. 2d 888 (W.D. Tenn. 2012) ... 5

*Doe v. County of Ctr.*,
242 F.3d 437 (3d Cir.2001). .......... 7

*Doe v. Deer Mountain Day Camp, Inc.*,
682 F. Supp. 2d 324 (S.D.N.Y. 2010).......... 9

*Donahue v. CONRAIL*,
52 F. Supp. 2d 476 (E.D. Pa. 1999) .......... 26

*E.E.O.C. v. Wal–Mart Stores, Inc.*,
477 F.3d 561 (8th Cir. 2007).......... 20

*Eady v. Big G Express*,
No. 3:21-CV-00432, 2021 WL 2650082 (M.D. Tenn. June 28, 2021). .......... 21

*Echazabal v. Chevron USA, Inc.*,
336 F.3d 1023 (9th Cir. 2003).......... 12, 13, 14, 15

*EEOC v. Burlington Northern & Santa Fe Ry.*,
621 F.Supp.2d 587 (W.D. Tenn. 2009).......... 9

*EEOC v. Hussey Copper Ltd.*,
696 F. Supp. 2d 505 (W.D. Pa. 2010) .......... 7, 8, 9

*Fasold v. Justice*,
409 F.3d 178 (3d Cir. 2005).......... 18

*Fowler v. Syncreon Am., Inc.*,
No. 3:17-cv-50156, 2020 WL 13610565 (N.D. Ill. Mar. 18, 2020) .......... 19

*Haas v. Wyo. Valley Health Care Sys.*,
553 F. Supp.2d 390 (M.D. Pa. 2008) .......... 8

*Henningsen v. City of Blue Earth*,
184 F. Supp. 3d 710 (D. Minn. 2016) .......... 13, 20

*Highland Tank & Mfg. Co. v. PS Int'l, Inc.*,
No. 3:04-cv-100, 2010 WL 1253887 (W.D. Pa. Mar. 30, 2010).......... 8

*Hill v. Greater Philadelphia Health Action, Inc.*,
No. 19-cv-4928, 2021 WL 3708685 (E.D. Pa. Aug. 19, 2021) .......... 9

*Hohn v. BNSF Ry. Co.*,
No. 8:05-cv-552, 2007 WL 2822754 (D. Neb. Sept. 26, 2007), *aff'd*,
707 F.3d 995 (8th Cir. 2013). .......... 12

In *Donahue v. Consol. Rail Corp.*,
224 F.3d 226 (3d Cir. 2000) .................................................................................. 10, 21

*In re Nexium (Esomeprazole) Antitrust Litig.*,
309 F.R.D. 107 (D. Mass. 2015) ............................................................................. 4, 5

*Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*,
903 F.3d 113 (3d Cir. 2018) ......................................................................................... 2

*Lincoln v. BNSF Ry. Co.*,
900 F.3d 1166 (10th Cir. 2018) .................................................................................. 22

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*,
263 F.3d 208 (2d Cir. 2001) ......................................................................................... 9

*Mayo v. Consolidated Rail Corp.*,
No. 96-656, 1999 U.S. Dist. LEXIS 22006 (W.D. Pa. June 23, 1999) ..................................... 26

*Mazur v. Sw. Veterans Ctr.*,
No. 17-cv-826, 2019 WL 4345726 (W.D. Pa. Sept. 12, 2019), *aff'd*,
803 F. App'x 657 (3d Cir. 2020) .................................................................................. 21

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) ..................................................................................................... 6

*McKenna v. City of Philadelphia*,
636 F. Supp. 2d 446 (E.D. Pa. 2009) .................................................................. 23, 24, 25

*Mills v. Union Pac. R.R. Co.*,
No. 1:22-cv-00143, 2024 WL 185246 (D. Idaho Jan. 16, 2024) ............................................. 6

*Monette v. Electronic Data Systems Corp.*,
90 F.3d 1173 (6th Cir. 1996) ......................................................................................... 6

*Nunes v. Wal-Mart Stores, Inc.,*
164 F.3d 1243 (1999) .................................................................................................. 19

*Osborne v. Baxter Healthcare Corp.*,
798 F.3d 1260 (10th Cir. 2015) ..................................................................................... 6

*Pesce v. New York City Police Dep't*,
159 F. Supp. 3d 448 (S.D.N.Y. 2016) ............................................................................. 9

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) ..................................................................................................... 5

*Romag Fasteners, Inc. v. Fossil, Inc.*,
979 F. Supp. 2d 264 (D. Conn. 2013) .......... 5

*Sanders v. Union Pac. R.R. Co.*,
No. 4:20-cv-3023, 2021 WL 4783629 (D. Neb. Oct. 7, 2021) .......... 6

*Seitz v. DeQuarto*,
777 F. Supp. 2d 492 (S.D.N.Y. 2011).......... 5

*Self v. BNSF Ry. Co.*,
No. 14-cv-618, 2016, U.S. Dist. LEXIS 15500 (W.D. Tex. Feb. 8, 2016) .......... 26

*Taylor v. Pathmark Stores, Inc.*,
177 F.3d 180 (3d Cir.1999) .......... 12

*Toyota Motor Mfg., Ky. v. Williams*,
534 U.S. 184 (2002).......... 13

*Umanzor v. New York City Police Dep't*,
No. 14-cv-9850, 2018 WL 840084 (S.D.N.Y. Feb. 12, 2018) .......... 9

*Walker v. Union Pac. R.R. Co.*,
No. 3:22-cv-01011, 2023 WL 10354310 (D. Or. Dec. 18, 2023), *report and recommendation adopted*, No. 3:22-cv-1011, 2024 WL 1052678 (D. Or. Mar. 11, 2024). .......... 11

*Walsh v. Bank of Am.*,
No. 3:06-cv-504, 2010 WL 569837 (M.D. Pa. Feb. 11, 2010).......... 18

*Walz v. Ameriprise Fin., Inc.*,
779 F.3d 842 (8th Cir. 2015) .......... 20

**Statutes**

42 U.S.C. § 12111(3) .......... 7

42 U.S.C. § 12112(a) .......... 6, 20, 21

42 U.S.C. § 12112(b)(6).......... 7

ADA .......... passim

**Rules**

Fed. Rule Civ. Proc. 8(e)(2) .......... 25

Fed. R. Civ. P. 56(f) .......... 2

**Other Authorities**

28 C.F.R. Part 35, App. A .......... 7

29 C.F.R. § 1630.2(r) .......... 7, 12

U.S. Const. amend. VII .......... 5

## INTRODUCTION

In 2016, Chris Snyder began suffering from seizures. Following successful brain surgery and with daily seizure medication, Snyder has remained seizure-free ever since. All four of his doctors cleared him to return to work without restrictions.

Snyder's employer, Norfolk Southern Railway Co., refused to reinstate him. Initially, Norfolk Southern told Snyder that he could return to work six months after his last seizure. That date came and went, however, without Norfolk Southern reinstating him. Then, Norfolk Southern told Snyder that it would reinstate him one year from his last seizure. But that date too came and went without Norfolk Southern reinstating him.

It wasn't until Snyder filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging a violation of the Americans with Disabilities Act (ADA) that Norfolk Southern finally reinstated him. That agency investigated Snyder's complaint and found there was probable cause to believe Norfolk Southern had violated the law.

Nevertheless, Norfolk Southern argues that it was so clearly allowed to withhold Snyder from service that we need not waste time with a jury trial. According to Norfolk Southern, Snyder continued to be a seizure risk despite his surgery to the point it would have been dangerous to allow him to return to work.

An employer can lawfully discriminate on the basis of disability if it demonstrates that it reasonably believed the employee's disability caused them to be a safety risk. This affirmative defense requires the employer submit testimony from the decision maker explaining the basis of that belief and demonstrating the reasonableness of it, testimony from a medical expert establishing the reasonableness of that belief, and/or citation to medical literature on which that belief is based.

Norfolk Southern has not—because it cannot—offered evidence of any of this. It has offered no testimony from the person who made the decision, its former medical director; no testimony from a retained expert and not even citation to medical literature. If anything, it is Snyder who is entitled to summary judgment.[1]

Instead, Norfolk Southern asks the Court to rubberstamp the decision made by its former medical director because she was its former medical director. The law requires more. Otherwise, employers would have an unfettered ability to discriminate against employees with disabilities so long as the decision is made by someone in its medical department, regardless of whether the bases for that decision are the very stereotypes the ADA was designed to combat.

Norfolk Southern's motion for summary judgment should be denied.

## BACKGROUND

Snyder has worked for Norfolk Southern as an electrician for nearly three decades. Dkt. 35, Pl. Resp. to Def. Prop. Facts at No. 3. There are multiple different electrician positions at Norfolk Southern, each with different duties. *Id.* at Nos. 7, 13. Critically, Snyder's electrician position does not involve operating locomotives, working at heights without fall protection, or handling live wires.[2] *Id.*

---

[1] Courts may grant summary judgment to a non-moving party provided the opposing party has notice and an opportunity to respond. *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 118 (3d Cir. 2018) (citing Fed. R. Civ. P. 56(f); *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence")).

[2] Norfolk Southern has argued that working at heights without fall protection is part of Snyder's job. But the testimony on which Norfolk Southern relies was given by someone who admitted that he does not know what position Snyder actually held, did not know above what height Snyder was prohibited from working without fall protection, and has received no training on reasonable accommodations. Dkt. 35, Pl. Resp. to Def. Prop. Facts at No. 45.

In 2016, Snyder began suffering from seizures. Dkt. 35, Pl. Resp. to Def. Prop. Facts at No. 18. Following successful brain surgery and with daily seizure medication, *id.* at No. 32, Snyder is seizure free. Dkt. 35, Pl. Resp. to Def. Prop. Facts at No. 35. All four of his doctors, including relevant specialists, released him to return to work as an electrician for Norfolk Southern without restrictions. *Id.* at Nos. 34, 45.

Norfolk Southern initially told Snyder that, pursuant to "NS Medical Department guidelines for an Electrician with a Seizure Disorder," he could return to work six months after his last seizure.[3] Dkt. 35, Pl. Resp. to Def. Prop. Facts at No. 45. Six months followed without a seizure and yet, Norfolk Southern did not reinstate Snyder. *Id.* at No. 45. Norfolk Southern then told Snyder that he could return to work one year after his last seizure. Dkt. 35, Pl. Resp. to Def. Prop. Facts at No. 45. A year followed without a seizure and Norfolk Southern still did not reinstate him. *Id.*

Frustrated by Norfolk Southern's inaction, and burdened by the lack of pay and the future economic uncertainty looming over him and his family, Snyder filed a complaint with the EEOC. Dkt. 35, Pl. Resp. to Def. Prop. Facts at No. 45. A few weeks later, Norfolk Southern reinstated Snyder. *Id.* Nothing about Snyder's condition had changed. *Id.*

After thoroughly investigating his complaint, the EEOC found probable cause to believe Norfolk Southern had violated the ADA, writing the following:

> Examination of the evidence reveals that Charging Party's medical specialists released Charging Party for work without restrictions in or about March 2017. However, even though cleared to return to work by his specialists, Respondent's medical personnel determined in or about April 2017, that Charging Party needed a period of six months from the date of his surgery in January 2017, to substantiate that he had control and stability over his Epilepsy. Then, after six months, Respondent's medical personnel concluded in July 2017, that Charging Party was restricted from performing the essential functions of the Shop Locomotive

[3] The guidelines do not actually exist. Dkt. 35, Pl. Resp. to Def. Prop. Facts at No. 45.

> Electrician with respect to working at heights and operating a locomotive. Respondent asserted that it could provide Charging Party an accommodation for operating a locomotive; but, it could not accommodate the height restriction.
>
> The fact is that Charging Party was medically cleared with no restrictions by his specialists and Respondent chose not to accept the release. Meanwhile, Respondent provided no evidence which supports its conclusions that Charging Party was not capable of performing the essential functions of his job upon release by his medical specialists.
>
> Accordingly, I find that there is reasonable cause to believe that Respondent failed to return Charging Party to work until February 9, 2018 . . . in violation of the ADA.

Dkt. 35-1, Pl. Prop. Facts at No. 2.

To date, Norfolk Southern has still not provided any evidence that supports its conclusions that Snyder was not capable of performing the essential functions of his job upon. Dkt. 35-1, Pl. Prop. Facts at No. 6. Absent from the record is testimony from Norfolk Southern's former medical director identifying the basis for her belief, testimony from another expert regarding the reasonableness of it, or citation to any medical literature with which her belief accords.

**LEGAL STANDARD**

"[A]ny motion for summary judgment must be approached with a high degree of skepticism, as granting such a motion runs the risk of improperly displacing the constitutional officers (jurors) to whom the Seventh Amendment assigns the sole authority to make factual determinations." *In re Nexium (Esomeprazole) Antitrust Litig.*, 309 F.R.D. 107, 115 (D. Mass. 2015). "All too often today, courts appear to stretch to grant summary judgment where the reverse ought be the case." *Id.* "Unless the factual record as to material issues is clear beyond peradventure, summary judgment ought be denied." *Id.* "Courts ought be especially wary of granting summary judgment upon the rationale 'no jury could possibly find . . . .'" *In re Nexium*, 309 F.R.D. at 115 n.11. "In all too many cases, this is a thinly disguised form of judicial factfinding, forbidden by

the Constitution in a jury case. *Id.* (citing U.S. Const. amend. VII ("In Suits at common law . . . the right of trial by jury shall be preserved.")).

"Moreover, absent binding admission by the non-moving party, it ought be well-nigh impossible for a party bearing the burden of proof to obtain summary judgment." *In re Nexium*, 309 F.R.D. at 115 n.11. "This is so because a court, while it must draw all reasonable inferences in favor of the nonmoving party [at summary judgment], it may not make credibility determinations or weigh the evidence because such tasks are jury functions, not those of a judge." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))) (substitution in *In re Nexium*) (internal quotation marks omitted) "Thus the many local rules adopting a point-counterpoint system which converts a failure to adduce affirmative contradictive evidence into an admission of the point advanced is simply contrary to *Reeves* when the moving party bears the burden of proof." *In re Nexium*, 309 F.R.D. at 115 n.11. "This point is now widely recognized." *Id.* (citing *Romag Fasteners, Inc. v. Fossil, Inc.*, 979 F. Supp. 2d 264, 273 n.5 (D. Conn. 2013); *Delano v. Abbott Labs.*, 908 F. Supp. 2d 888, 897 n.4 (W.D. Tenn. 2012); *Seitz v. DeQuarto*, 777 F. Supp. 2d 492, 495 n.2 (S.D.N.Y. 2011)).

## ARGUMENT

Summary judgment should not be granted to Norfolk Southern because Norfolk Southern has not shown (and cannot show) what it must: that it reasonably believed Snyder posed a significant risk of serious harm that could not be sufficiently ameliorated via a reasonable accommodation. Norfolk Southern's arguments to the contrary apply the wrong legal framework to misrepresented facts, unsupported assumptions, and inferences to which Norfolk Southern is not entitled. Any one of these errors would be fatal to Norfolk Southern's argument, much less all of them together.

## I. NORFOLK SOUTHERN EFFECTIVELY CONCEDES THAT THE DIRECT-THREAT FRAMEWORK APPLIES.

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability . . . ." 42 U.S.C. § 12112(a). Violations of this prohibition can be proved through direct or circumstantial evidence. For proof through circumstantial evidence, courts apply the well-known framework introduced by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

Where, as here, the employee's protected status is inextricably intertwined with an employer's decision, the *McDonnell Douglas* paradigm does not apply. *See*, *e.g.*, *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 988 (9th Cir. 2007) (noting that the use of burden shifting is incorrect when it is undisputed that an employer made an employment decision on a proscribed basis); *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1182 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) ("The *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant[.]"); *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1264-65 (10th Cir. 2015); *Mills v. Union Pac. R.R. Co.*, No. 1:22-cv-00143, 2024 WL 185246, *1-2 (D. Idaho Jan. 16, 2024); *Sanders v. Union Pac. R.R. Co.*, No. 4:20-cv-3023, 2021 WL 4783629, *1-5 (D. Neb. Oct. 7, 2021).

That the *McDonnell-Douglas* framework does not apply to this case is something Norfolk Southern appears to concede. It starts its analysis under the direct-threat framework, which is an affirmative defense on which Defendant bears the burden.[4] *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 606 (M.D. Pa. 2014) ("Rather than challenging Plaintiff's ability to establish a *prima*

---

[4] To be sure, Norfolk Southern creates confusion by arguing Snyder cannot make a "prima facie case of discrimination" but then proceeding to apply the direct-threat framework. See Mot. at 5, 7.

*facie* case of discrimination, Defendant argues that Plaintiff's claims are barred by its defense. . . that Plaintiff posed a direct threat to the safety of himself, other employees, and the public. . . . Accordingly, the court's preliminary analysis as to Plaintiff's discrimination claims begins with Defendant's affirmative defense").

## II. NORFOLK SOUTHERN HAS NOT MET ITS BURDEN.

"The ADA prohibits an employer from applying a qualification standard "that screen[s] out or tend[s] to screen out an individual with a disability or a class of individuals with disabilities." *Bender*, 994 F. Supp. 2d 593, 607 (M.D. Pa. 2014) (citing 42 U.S.C. § 12112(b)(6)). "The direct threat exception allows discrimination if a disability "poses a direct threat to the health and safety of others," that cannot be eliminated by a modification of policies, practices, or procedures, or with the provision of additional aides or services." *EEOC v. Hussey Copper Ltd.*, 696 F. Supp. 2d 505, 519 (W.D. Pa. 2010) (citing 28 C.F.R. Part 35, App. A at 483); *see also Doe v. County of Ctr.*, 242 F.3d 437, 447 (3d Cir.2001).

A "direct threat" is "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." *Hussey Copper*, 696 F. Supp. 2d 505 at 610 (citing 29 C.F.R. § 1630.2(r); 42 U.S.C. § 12111(3)). "The key inquiry . . . is 'not whether a risk exists, but whether it is significant.'" *Bender*, 994 F. Supp. 2d at 607 (quoting *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998)). This determination by an employer "must be based on 'a reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence and upon an individualized assessment of the individual's present ability to safely perform the essential functions of the position.'" *Id.* (quoting *Chevron*, 536 U.S. at 86)).

The Supreme Court has further explained that "[t]he exception can only be invoked where a risk is significant: 'because few, if any, activities in life are risk free . . . the ADA does not ask

whether a risk exists, but whether it is significant." *Hussey Copper*, 696 F. Supp. 2d at 520. The direct threat's "'rigorous objective inquiry' must be based on medical or other objective evidence, applying the four factors set out in *Arline*." *Hussey Copper*, 696 F. Supp. 2d at 520 (citing *Bragdon*, 524 U.S. at 626; *Haas v. Wyo. Valley Health Care Sys*., 553 F.Supp.2d 390, 398 (M.D. Pa. 2008)).

### A. Norfolk Southern has not submitted any evidence supporting the reasonableness of its former medical director's purported belief.

Norfolk Southern claims its former medical director "carefully reviewed Plaintiff's medical records and referenced other guidance on his seizure disorder to determine the duration of his elevated risk of recurring seizures." Dkt. 34, Def. Br. at 8. One would therefore expect Norfolk Southern to have identified the guidance on which she relied, explain why that guidance supersedes the opinions of Snyder's doctors, and quantified the extent to which Snyder's risk of seizures has supposedly been elevated. None of these things, however, are something Norfolk Southern has done.

Absent from the record is any testimony from Norfolk Southern's medical director, much less testimony describing what she believed, explaining why she believed it, or supporting the reasonableness of that belief. Also absent from the record is the opinion of any expert supporting the reasonableness of Norfolk Southern's former medical director's purported belief. Finally, absent from the record is citation to any medical literature supporting that Snyder is at an increased risk for seizures.

Ultimately, Norfolk Southern has shown only what it did, not why it did it, instead providing only naked argument. That kind of argument, this court has made clear, is insufficient to warrant dismissal of claims even in cases where the movant's burden is less onerous. *Highland Tank & Mfg. Co. v. PS Int'l, Inc.*, No. 3:04-cv-100, 2010 WL 1253887, at *3 (W.D. Pa. Mar. 30, 2010). In cases like this one, where the employer must prove the reasonableness of its belief, it

cannot be seriously argued that unsupported argument is sufficient. *Hussey Copper*, 696 F. Supp. 2d at 520 (finding employer had failed to meet burden of direct threat affirmative defense on summary judgement, "In essence, the only information on which Hussey based its decision is the conclusion of Dr. Nackley, and . . . the speculation that there may be future manifestations of side effects from Teaford's use of methadone."); *EEOC v. Burlington Northern & Santa Fe Ry.*, 621 F.Supp.2d 587 (W.D. Tenn. 2009) (denying summary judgment as to direct threat exception where physician never personally examined the plaintiff); *Umanzor v. New York City Police Dep't*, No. 14-cv-9850, 2018 WL 840084, at *5 (S.D.N.Y. Feb. 12, 2018) ("[I]n order to survive summary judgment, a defendant must present the court with objective, medical evidence—such as reliable medical guidelines, literature, or expert testimony—to establish that their direct threat assessment was reasonable.") (quoting *Doe v. Deer Mountain Day Camp, Inc.*, 682 F. Supp. 2d 324, 347 (S.D.N.Y. 2010)) (internal quotation marks omitted).

As one court put it: "The evidence at hand in this case presents close to the platonic ideal of a 'genuine dispute of material fact.' Defendant leans on the report of its Chief Medical Officer [ ] in arguing Plaintiff posed a direct threat to the employer. However, [that] report sits beside the evaluation of an equally qualified doctor who actually interacted directly with Plaintiff." *Hill v. Greater Philadelphia Health Action, Inc.*, No. 19-cv-4928, 2021 WL 3708685, at *4 (E.D. Pa. Aug. 19, 2021) (denying summary judgment, holding that the defendant failed to demonstrate that employee's seizures posed a direct threat); *see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 220–21 (2d Cir. 2001) (reversing summary judgment for defendant where "The physician [defendant] asked to review the plaintiff's condition.... said nothing to indicate that she posed a significant risk of harm to herself or others in performing her duties."); *Pesce v. New York City Police Dep't*, 159 F. Supp. 3d 448, 457 (S.D.N.Y. 2016) (declining to grant summary

judgment as both defendant and plaintiff had multiple medical professionals presenting conflicting evidence as to plaintiff's fitness for work); *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 331 (3d Cir. 1995) ("At the summary judgment stage, 'it is not the court's role to weigh the disputed evidence and decide which is more probative.'").

A different outcome is not supported by the cases on which Norfolk Southern relies. In *Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 231 (3d Cir. 2000), which predates the ADA's 2008 amendment by almost a decade, the Third Circuit upheld the district court's dismissal of the employee's claim because it was "clear" that employing an individual as a train dispatcher who was at risk of losing consciousness on the job was a "significant risk to others." But the employee in that case's own doctor opined that the employee "remained at risk of passing out unexpectedly and that he should not work on or around moving trains." *Id.*, 228.

In comparison, four different doctors in this case, including relevant specialists, opined that Snyder should be returned to work without restrictions. *Supra*, 8. Nevertheless, Norfolk Southern's former medical director purportedly believed that Snyder posed a significant risk of substantial harm. The basis for that belief has not been provided. These differences more than distinguish this case from *Donahue*, and that case is still better for Norfolk Southern than the other case on which it relies, *Anderson v. Norfolk Southern Railway Company*, No. 21-1735, 2022 WL 1073581 (3d Cir. Feb. 11, 2022). In *Anderson*, the Third Circuit affirmed the district court's dismissal of a disability-discrimination claim that had been brought against Norfolk Southern by another of its employees. at *3. The affirmation was based on Norfolk Southern having submitted exactly what it has not in this case: testimony from its former medical director explaining the reasoning behind her decision and demonstrating the reasonableness of it. *Id.*, *3 (citing JA 0090, 0093–103, 0165 (testimony from Norfolk Southern's former medical director)).

*Anderson* shows that Norfolk Southern knew what it had to submit to prove the reasonableness of its former medical director's belief. Yet, it chose not to submit it. *Anderson* therefore undermines Norfolk Southern's argument in support of its motion for summary judgment, not the other way around.

The importance of requiring employers to produce the kind of evidence Norfolk Southern produced in *Anderson* was well illustrated by the District of Oregon in *Walker v. Union Pac. R.R. Co.*, No. 3:22-cv-01011, 2023 WL 10354310, at *13 (D. Or. Dec. 18, 2023), *report and recommendation adopted*, No. 3:22-cv-1011, 2024 WL 1052678 (D. Or. Mar. 11, 2024). In that case, a railroad argued that it was entitled to withhold its employee from service without pay because, according to it, his color-vision deficiency caused him to be pose a significant risk of serious harm. 2023 WL 10354310, *1-5. The court noted that, "[t]o protect disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear, the Supreme Court has required an individualized direct threat inquiry that relies on the best current medical or other objective evidence." *Id.*, 2023 WL 10354310, *13. (quoting *Nunes*, 164 F.3d at 1248) (internal quotation marks omitted). This inquiry, the court found, is something the railroad did not show it had done because it offered no medical or other objective evidence supporting its medical director's decision. *Walker*, 2023 WL 10354310, *13.

Norfolk Southern has not shown (and cannot show) what it must, that it reasonably believed that Snyder poses a serious risk of substantial harm. Indeed, if anyone is entitled to summary judgment on this matter, it is Snyder.

**B. The evidence demonstrate that the purported opinion of Norfolk Southern's former medical director was unreasonable.**

Even could Norfolk Southern's unsupported arguments being taken at face value, summary judgment would still not be warranted. That is because the arguments are not only unsupported but also contrary to the evidence.

To prove that an employee poses a significant risk of substantial harm, "an employer must demonstrate that it has made an individualized assessment of the employee's ability to perform the essential functions of the job, based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Echazabal v. Chevron USA, Inc*., 336 F.3d 1023, 1027 (9th Cir. 2003) (quoting 29 C.F.R. § 1630.2(r)) (internal quotation marks omitted); *see also Hohn v. BNSF Ry. Co.*, No. 8:05-cv-552, 2007 WL 2822754, at *5 (D. Neb. Sept. 26, 2007), *aff'd*, 707 F.3d 995 (8th Cir. 2013).

To perform an individualized assessment, employers must gather "substantial information about an employee's work history and medical status" and base their decision "upon particularized facts using the best available objective evidence . . . ." *Echazabal*, 336 F.3d at 1028. "A subjective belief in the existence of a risk, even one made in good faith, will not shield the decisionmaker from liability." *Id.* at 1028 (*citing Bragdon v. Abbott,* 524 U.S. 624 (1998)). "Indeed, it is only through a proper individualized assessment that an employer can show that the applicant would pose a significant risk of substantial harm in the safety-sensitive position." *Bender*, 994 F. Supp. 2d at 612; *see also Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 193 (3d Cir.1999) (finding that it is the employer's burden to educate itself about the varying nature of an impairment and to make an individualized determination about an affected employee); *Britting v. Shineski*, Civ. A. No. 08–1747, 2010 WL 500442, *6 (M.D.Pa. Feb. 5, 2010) ("When an impairment is the type whose symptoms will vary greatly from person to person, [an employer] must engage in an individualized

assessment of the effect of the impairment" in the employee or applicant's own experience) (citing *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184, 199, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)).

Employers must also demonstrate that they considered, "in detail," the (1) duration of risk, (2) nature and severity of the potential harm, (3) likelihood that the potential harm will occur, and (4) imminence of the potential harm. *Echazabal,* 336 F.3d at 1031; *see also Bender*, 994 F. Supp. 2d at 607 (same); *Henningsen v. City of Blue Earth*, 184 F. Supp. 3d 710, 720 (D. Minn. 2016). Medical professionals who provide adverse opinions must therefore be aware of the "specific risks" of the employee's position, be trained and have experience in the specific medical field tied to the employee's condition, and know the employee's prior work history, including whether the employee ever suffered a work accident or injury due to the condition. *See*, *e.g.*, *Echazabal,* 336 F.3d at 1031-33.

The Ninth Circuit's decision is *Echazabal* is instructive. There, Chevron revoked a "coker position" job offer to the employee after a pre-employment medical exam by Chevron's physician revealed that the employee's liver "was releasing higher than normal levels of enzymes." *Id.* at 1026. At the time, the employee was working in Chevron's "coker unit," but he was employed through a third-party contractor. *Id.* Based on its physician's opinion, Chevron concluded that the employee's "health might be at risk from exposure to chemicals present in the coker unit and rescinded its offer." *Id.*

Later, Chevron again offered the employee a job contingent upon passing a medical examination. *Id.* at 1026-27. This time, after the exam, Chevron not only revoked the job offer but also asked the third-party contractor to remove the employee from the refinery. *Id.* at 1027. As a result, the employee lost his employment. *Id.*

The employee sued, alleging discrimination under the ADA. *Id.* at 1025. After remand by the Supreme Court, the Ninth Circuit considered "whether Chevron . . . met the requirements for assertion of the direct threat defense." *Id.* The Ninth Circuit ruled that Chevron had not presented sufficient evidence to warrant judgment as a matter of law on its direct threat defense, and in the process, laid out the burden required to prove an employee poses a significant risk of substantial harm. *Id.* at 1025-35.

In support of its defense, Chevron argued that it relied on the "facially reasonable" opinions of its medical providers and therefore should not be held liable. *Id.* at 1028. The Ninth Circuit rejected Chevron's argument, noting that the physicians who performed the employee's pre-employment medical exams had no "special training in liver disease." *Id.* The Court held that the "required assessment could not be based upon common sense, as Chevron argue[d], but rather only after—at a minimum—a consultation with a medical professional who made an objective, scientific judgment." *Id.* at 1029. As a result, the Ninth Circuit held that the physicians' expertise in preventative and general medicine was insufficient to satisfy the high burden of proving the employee's liver condition caused him to pose a direct threat. *Id.*

The Ninth Circuit also held that satisfying the direct threat defense necessitated Chevron proving that the employee's medical condition created a substantial risk of harm "beyond that faced by other workers" in the refinery. *Id.* at 1029. In finding that Chevron failed to satisfy this standard, the Court noted that the opinions of the employee's experts, who were "specialists in toxicology and liver disease" and who conducted scientifically valid tests to measure liver function, "revealed that [the employee's] liver was functioning properly." *Id.* In contrast, the tests conducted by Chevron's physicians did not reveal liver function. *Id.* Therefore, Chevron presented

no proof that the employee's liver posed any risk beyond that posed to all employees within the coker room. *See id.*

Next, the Ninth Circuit held that to satisfy its direct-threat burden, Chevron "was required to do more than consider generalized statements of potential harm." *Id.* at 1030. Rather, Chevron was required to present medical or scientific evidence "supporting a finding that [the employee's] chemical exposure from working as a plant helper or in the coker unit would present an appreciable or clinically significant risk." *Id.* at 1029. In ruling that Chevron failed to meet this burden, the Court held that a general statement from employee's primary-care physician that the employee should avoid exposure to the toxic chemicals was "insufficient to carry Chevron's burden of establishing that it relied on the most current medical knowledge and/or the best available objective evidence and that it considered the likelihood of harm, its possible severity, and imminence." *Id.* at 1030 (internal quotation marks omitted). The Court continued:

> Notably missing from this statement is any indication that Dr. Weingarten was asked to consider the specific chemical exposures, to indicate the levels at which they would become dangerous or the likelihood that they would injure Echazabal, or even whether the risk to Echazabal was any greater than that for a healthy individual. (Indeed, it is difficult to imagine that any responsible doctor would recommend exposure of even his healthiest patient to an unspecified amount of hepatotoxic chemicals.)

*Id.* As such, the evidence presented by Chevron did not satisfy the direct-threat standard. *See id.*

The defective evidence presented by Chevron in *Echazabal* is formidable compared to what Norfolk Southern has offered to support the reasonableness of its former medical director's belief:

- Norfolk Southern's former medical director purportedly concluded Snyder posed a serious risk of substantial harm despite not examining him, talking with his treating doctors, and/or consulting a relevant specialist. "Purportedly" is an operative word in the forgoing sentence because absent from the record is any testimony from Norfolk Southern's medical director affirming that what Norfolk Southern claims she believed is, in fact, what she believed.

- Norfolk Southern's former medical director is an occupational-medicine doctor, not a neurosurgeon or neurologist. Yet, she ignored the opinions of Snyder's neurosurgeon, two neurologists, and at least one other doctor.

- Absent from the record is any explanation from Norfolk Southern's former medical director regarding why she believed Snyder's condition caused him to pose a serious risk of substantial harm, much less demonstrating the reasonableness of it. Neither has Norfolk Southern cited to the opinion of any medical expert supporting the reasonableness of its former medical director's belief.

- Norfolk Southern has neither tried to quantify the risk Snyder supposedly posed nor cited to any medical literature supporting the belief of its former medical director.

- Norfolk Southern initially told Snyder that its policy was to allow him to return to work six months after his last seizure. There was, in fact, no policy; and the six-month date came and went with Snyder being reinstated. Then, Norfolk Southern's former medical director informed Snyder that railroad's policy was to allow him to return to work one year after his last seizure. That date too, however, came and went without Norfolk Southern reinstating Snyder. It wasn't until Snyder filed a charge with the EEOC that Norfolk Southern finally reinstated him. Nothing about Snyder's condition had changed from when Norfolk Southern's former medical director had last refused to reinstate him. The only thing that changed was that Snyder filed a complaint with the EEOC.

- The EEOC thoroughly investigated Snyder's complaint and found that there is probable cause to believe Norfolk Southern had violated the ADA.

*Supra*, 4.

Any of these defects would warrant denial of Norfolk Southern's motion for summary judgment, much less all of them together. And none of these defects are rectified by the arguments Norfolk Southern has made in support of its motion for summary judgment. Indeed, Norfolk Southern's arguments do the opposite.

For example, Norfolk Southern tries to disclaim responsibility for its decision, asserting the FRA compelled it to withhold Snyder from service. Dkt. 34, Def. Br. at 7-9. This is untrue. The FRA has said the following:

> Simply stated there are no industrial regulations limiting your employment and the medical restriction are solely company based. There is no regulatory reason

> to withhold you from service and the railroad should provide you or your labor representative the written policy that are the basis for doing so.

Dkt. 35, Pl. Resp. to Def. Prop. Facts, No. 1.

The falsity of Norfolk Southern's assertion undermines its argument that it reasonably believed Snyder posed a significant risk of substantial harm. The Third Circuit has long recognized that falsity of an employer's explanation for its decision is evidence of unlawful discrimination. *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 329-31 (3d Cir. 1995). By arguing that the FRA compelled it to withhold Snyder from service, which is untrue, Norfolk Southern has undermined its claim that it reasonably believed Snyder posed a significant risk of substantial harm, not supported it.

The falsity of Norfolk Southern's arguments does not end there. At one point in its brief, Norfolk Southern argues that "**[a] six-month period** was found to be enough to mitigate the risk of recurrence . . ." Dkt. 33, Def. Br., at 10 (emphasis added). Norfolk Southern supports its claim by citing to a letter it sent to Snyder in June of 2016, in which it explained to him that its decision was pursuant to the "NS Medical Department guidelines for an Electrician with a Seizure Disorder," which do not actually exist. *Supra*, 3. A paragraph later, Norfolk Southern claims that its medical department "determined that if Plaintiff's medical records could establish his seizures were controlled sufficiently by a stable medication regimen for **a year**, it could remove the restriction [it had issued that was causing him to be withheld from service]." *Id.* Dkt. 33, Def. Br., at 10 (emphasis added). Nowhere in its brief does Norfolk Southern acknowledge the apparent change in its policy, much less explain the reason for it.

Even had Norfolk Southern explained the reason for initially telling Snyder he had to wait six months and then telling him he had to wait a year, the change would still undermine the reasonableness of its former medical director's belief. This principle was well explained by the

Middle District of Pennsylvania in *Walsh v. Bank of Am.*, No. 3:06-cv-504, 2010 WL 569837 (M.D. Pa. Feb. 11, 2010). The employer in that case changed the policy pursuant to which it terminated its employee shortly after it learned of his disability. *Id.*, *8. Because of the temporal proximity between the change and termination, the court found that "a reasonable jury could conclude that changed performance standards were a mere pretext for defendant's actual goal: terminating plaintiff's employment." *Id.*

Worse yet for Norfolk Southern, its former medical director ultimately followed neither policy. Snyder's last seizure was in March of 2016; yet, Snyder was not reinstated six months later, in September of 2016. *Supra,* 16. Neither was he reinstated one year later, in March of 2017. *Id.* Norfolk Southern instead waited until after Snyder filed a complaint with the EEOC to reinstate him. *Id.*

Whatever the reason for the about face, Norfolk Southern telling Snyder one thing and then doing another belies any argument that its former medical director reasonably believed that he posed a significant risk of substantial harm. That's because an employer's failure to follow its own policy is evidence that the employer's justification for its decision is pretext for discrimination. *Fasold v. Justice*, 409 F.3d 178 (3d Cir. 2005).

For any and all of these reasons, Norfolk Southern's arguments are not only unsupported but also untrue. It is therefore Snyder if anyone who should be awarded summary judgment.

### C. Norfolk Southern has not proven that there was no reasonable accommodation that would sufficiently reduce the risk.

Even assuming that the Norfolk Southern could show that its former medical director reasonably believed that Snyder posed a significant risk of serious harm, that would not end the analysis. When an employer proves that its employee posed a significant risk of serious harm, the Court must then "ask whether the employer can make a reasonable accommodation, without undue

hardship to the employer, so that the employee can perform her job without such risk." *Nunes*, 164 F.3d at 1248. This showing is one Norfolk Southern cannot make.

There are two things that Snyder supposedly could not do without posing a risk: operate a locomotive and work at heights without fall protection. The first could be accommodated cannot be seriously disputed: Snyder presently does not operate locomotives. *Supra*, 2. As to working at heights without wearing fall protection. Snyder testified that he never works at heights without fall protection, and the only person to claim otherwise was unfamiliar with Snyder's actual job. *Supra*, 2. This, at the very least, creates a material dispute of fact that warrants Norfolk Southern's motion for summary judgment being denied. *Fowler v. Syncreon Am., Inc.*, No. 3:17-cv-50156, 2020 WL 13610565, at *6 (N.D. Ill. Mar. 18, 2020).

## III. NORFOLK SOUTHERN'S REMAINING ARGUMENTS USE THE WRONG LEGAL FRAMEWORK TO ANALYZE MISREPRESENTED FACTS, UNSUPPORTED ASSUMPTIONS, AND INFERENCES TO WHICH NORFOLK SOUTHERN IS NOT ENTITLED.

Although the above-performed analysis, under the direct-threat paradigm, is dispositive of Norfolk Southern's motion for summary judgment, four other arguments have been made. These arguments rely on a misapplication of law to misrepresented facts. None warrant summary judgment in favor of Norfolk Southern.

### A. Snyder is a qualified individual.

Norfolk Southern circularly argues that Snyder is not a "qualified individual" because of his disability. Dkt. 33, Def. Br., 7-11. This argument fails because for the reasons discussed *supra* at 6. Norfolk Southern's argument also fails because it attempts to graft an issue on which it will bear the burden at trial (and therefore must meet a heightened standard on summary judgment) onto an element of Snyder must prove.

The ADA prohibits covered employers from "discriminat[ing] against a **qualified individual** on the basis of disability . . . ." 42 U.S.C. § 12112(a) (emphasis added). "Whether an individual is qualified within the meaning of the ADA is determined by applying a two-part test." *Henningsen*, 184 F. Supp. 3d at 720 (D. Minn. 2016) (quoting *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 845 (8th Cir. 2015).) (internal quotation marks omitted). "The first inquiry is whether [the employee] possess the requisite skills, education, certification or experience necessary for the job." *Henningsen*, 184 F. Supp. 3d at 720 (quoting *E.E.O.C. v. Wal–Mart Stores, Inc.*, 477 F.3d 561, 568–69 (8th Cir. 2007)) (internal quotation marks omitted). "The second part asks whether [the employee] can, despite [his or her] impairments, perform the essential functions of the job either with or without reasonable accommodation." *Id.* (some alteration in *Henningsen*).

That Snyder possess the requisite skills, education, certification and/or experience necessary for his job is not in dispute. Neither does anyone dispute that Snyder can physically do his job. Instead, Norfolk Southern argues that Snyder could not **safely** do his job because of he might have suffered another seizure.

When an employer argues that its employee cannot **safely** do his job, it must prove that he is a direct threat, not the other way around. As the District of Minnesota has explained:

> The City focuses its argument on the second part of the test, asserting that Henningsen is unqualified because his epilepsy poses a direct threat to the health and safety of others, as well as himself. An individual who cannot safely perform the essential functions of his job because it poses a direct threat to himself or others is not qualified. 42 U.S.C. § 12113(b). The "direct threat" defense is an affirmative defense that the employer bears the burden of proving.

*Henningsen*, 184 F. Supp. 3d at 720 (citations omitted); *see also Campbell v. Union Pac. R.R. Co.*, No. 4:18-cv-00522-BLW, 2020 WL 5300734 (D. Idaho Sept. 4, 2020) (ADA plaintiff "need not prove he was able to safely perform the essential function of the [ ] position to establish his prima

facie case. Instead, the Court will review whether [his] disability posed a threat to himself, other employees, or the public, within the context of [the] 'direct threat' affirmative defense.").

A different conclusion is not supported by the cases to which Norfolk Southern cites. In the first case, *Donahue*, 224 F.3d at 230, the Third Circuit declined to rule on who bears the burden. But that case was decided nearly a decade before the ADA's 2008 amendment, and the Third Circuit has since made clear that the burden is generally on the employer. *Coleman v. Pennsylvania State Police*, 561 F. App'x 138, 145 n.9 (3d Cir. 2014). Indeed, in the other case to which Norfolk Southern cites, *Anderson*, 2022 WL 1073581 at *2, the Third Circuit affirmed the district court's order because the employer had "established" that its employee was a direct threat, not because the employee failed to establish that he was not a direct threat.

**B. Snyder was subject to an adverse action.**

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability . . . ." 42 U.S.C. § 12112(a). But not every discriminatory action rises to the level of being illegal. *Eady v. Big G Express*, No. 3:21-CV-00432, 2021 WL 2650082, at *2 (M.D. Tenn. June 28, 2021). Only actions that could dissuade an objectively reasonable employees from engaging in protected activity are prohibited. *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67–71 (2006)).

This requirement, known as the adverse-action requirement, should not be in dispute in this case. Snyder was indefinitely withheld from service without pay, and every court of which Snyder is aware that has considered the issue has found that the threat of being withheld from service without pay could dissuade an objectively reasonable employee. *See*, *e.g.*, *Mazur v. Sw. Veterans Ctr.*, No. 17-cv-826, 2019 WL 4345726, at *29 (W.D. Pa. Sept. 12, 2019), *aff'd*, 803 F. App'x 657 (3d Cir. 2020).

Nevertheless, Norfolk Southern has included a section in its brief titled "Plaintiff was not subjected to an adverse employment action." Dkt. 33, Def. Br. at 11. In it, however, Norfolk Southern seems to be arguing that its action was not discriminatory, not that it wasn't adverse. Indeed, there seems to be no dispute even in the case on which Norfolk Southern relies, *Anderson*, 2022 WL 1073581, that withholding an employee from service without pay is an adverse action.

**C. Although Snyder need not prove pretext, there is ample evidence of it.**

Next, Norfolk Southern argues that Snyder cannot prove pretext. Dkt. 33, Def. Br. at 11-12. Pretext, however, is something employees need not prove when the employer's justification for the adverse action is inextricably intertwined with their disability. *Supra*, 21. And, in any event, the evidence that prevents Norfolk Southern from proving the direct-threat defense is evidence of pretext.

Proving pretext may be done by pointing to "weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Aubrey v. Koppes*, 975 F.3d 995, 1015 (10th Cir. 2020) (quoting *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1193 (10th Cir. 2018) (internal quotation marks omitted). An employer's inability to prove the reasonableness of its belief is therefore evidence of pretext.

In *Bailey v. Metal-Fab, Inc.*, No. 19-cv1098, 2020 WL 6077315 (D. Kan. Oct. 15, 2020), for example, the employee was a sheet-metal fabricator, who was terminated because, according to her employer, her seizure condition caused her to pose a significant risk of serious harm that could not be sufficiently ameliorated with a reasonable accommodation. *Id.*, *1-4. The extent to which she actually posed a risk, however, was called into question by numerous pieces of evidence, like her doctors' opinions. *Id.*, *11-13. This, according to the court, meant that the employer

justification could be "a pretext masking [its] irrational fears about [the employee's] condition" and that a jury could therefore reasonably find that the employer had violated the ADA. *Id.*

Norfolk Southern cannot show that it reasonably believed Snyder was a direct threat. S*upra*, 20. To the extent Snyder must show pretext, he has therefore done it.

**D. Snyder's receipt of benefits is irrelevant.**

Finally, Norfolk Southern argues that "Plaintiff is not entitled to back pay or front pay damages for the time he claimed sickness benefits due to Total Disability from the Railroad Retirement Board[.]" Dkt. 33, Def. Br. at 15 (internal quotation marks omitted). Norfolk Southern's argument is wrong in fact. Snyder did not receive total-disability benefits from the Railroad Retirement Board (RRB). Norfolk Southern's argument is also wrong in law. Receipt of disability benefits from the RRB, without more, does not prevent discriminated against employees from seeking wage loss.

Before discussing the ways in which Norfolk Southern's argument is wrong, it is worth discussing the interplay between receipt of benefits from the RRB and an employee's ability to seek wage loss. As explained by the court in the case on which Norfolk Southern relies, *McKenna v. City of Philadelphia*, 636 F. Supp. 2d 446 (E.D. Pa. 2009), employees' receipt of total-disability benefits from the RRB's equivalent for non-railroaders, the Social Security Administration, can be evidence that their disabilities prevent them from working, and employees cannot recover wage loss in for periods which they are unable to work. As the court explained, however, the receipt of total disability benefits from the Social Security Administration is just evidence that the employee could not work, not dispositive of the issue.

With this in mind, we can return to Norfolk Southern's argument, addressing why it is wrong in law and fact.

***1. Wrong In Fact***

Norfolk Southern claims that Snyder received total disability benefits from the RRB. This is untrue. Snyder received sickness and unemployment benefits from the RRB, Dkt. 35, Pl. Resp. to Def. Prop. Facts at Nos. 63-64, which will have to be repaid from any wage loss he is awarded, *Pay for Time Lost From Regular Railroad Employment*, Railroad Retirement Board, available at www.rrb.gov/sites/default/files/2022-02/IB-4.pdf (last visited May 15, 2024). Snyder did not receive disability benefits from the RRB, total or otherwise. Dkt. 35, Pl. Resp. to Def. Prop. Facts, Nos. 63-64.

No court of which Snyder is aware has held that receipt of sickness and/or unemployment benefits from the RRB is even evidence that a discriminated-against employee was unable to work, much less that it estops him from seeking wage loss. There not being such an opinion makes sense given the differences between the benefits Snyder actually received and disability benefits. *Railroad Retirement Handbook*, Railroad Retirement Board (2021), at 17-18, 25, 32, 36, 38, available at www.rrb.gov/sites/default/files/202107/2021%20Railroad%20Retirement%20Handbook.pdf (last visited May 15, 2024).

In fairness to Norfolk Southern, Snyder did receive disability benefits from a private insurer. Dkt. 35, Pl. Resp. to Def. Prop. Facts at No. 64. But this demonstrates nothing more than a private insurer providing benefits to Snyder because Norfolk Southern was withholding him from service. Absent from the record is any evidence that Snyder averred to the private insurer, or anyone else for that matter, that he believed he was unable to work because of his disability.

This distinction means a world of difference. Receipt of total-disability benefits from the RRB may be evidence of an employee's inability to work because, as explained by the court in the case on which Norfolk Southern relies, *McKenna*, 636 F. Supp. 2d 446, the agency requires the

employee to aver that he is unable to work. Without that averment, the receipt of benefits is of no evidentiary value.

Here, there is nothing in the record demonstrating that Snyder averred that he was unable to work. Neither is Snyder aware of any case in which a court has held that an employee's receipt of disability benefits from a supplemental insurer is evidence of the employee's inability to work. Perhaps that is why Norfolk Southern has tried to convince the Court into believing that Snyder received total disability benefits from the RRB when he has not.

***2. Wrong in Law***

Even had Snyder averred that he was unable to work, that would not estop him from seeking wage loss. An application for benefits, as explained by the case on which Norfolk Southern relies, *McKenna*, 636 F. Supp. 2d 446, is just evidence that an employee could not work. An employee who can explain the apparent inconsistency between his averment and his claim for wage loss can recover wages despite having received benefits.

Had any such inconsistency existed in this case, Snyder could have easily explained it away. Norfolk Southern was refusing to let him work because of his disability. Any averment to an inability to work would therefore be nothing more than confirmation of this fact, not an admission that Snyder's disability actually prevented him from being able to work.

As such, any claimed inconsistency between Snyder's application for benefits and claim for wage loss in this case would be precisely the "sort normally tolerated by our legal system." *Cleveland*, 119 S.Ct. at 1603. "Our ordinary Rules recognize that a person may not be sure in advance upon which legal theory she will succeed, and so permit parties to set forth two or more statements of a claim or defense alternately or hypothetically, and to state as many separate claims or defenses as the party has regardless of consistency." *Id.* (quoting Fed. Rule Civ. Proc. 8(e)(2)) (internal quotation marks omitted).

Neither has Norfolk Southern cited to nor is Snyder aware of any case in which a court has held that an employee's application for benefits from a supplemental insurer estops him from claiming that he is a qualified individual within the ADA's meaning. There are, however, cases in which courts have held the opposite. *Self v. BNSF Ry. Co.*, No. 14-cv-618, 2016 U.S. Dist. LEXIS 15500 (W.D. Tex. Feb. 8, 2016); *Mayo*, 1999 U.S. Dist. LEXIS 22006, and *Donahue v. CONRAIL*, 52 F. Supp. 2d 476 (E.D. Pa. 1999). The logic of the courts in these cases, including that the benefit applications do not take into account whether a reasonable accommodation would allow applicants to perform their job's essential functions, is persuasive and should be adopted by this Court.

**CONCLUSION**

For the above-discussed reasons, the Court should not only deny Norfolk Southern's motion for summary judgment but also grant summary judgment to Snyder.

Dated: May 15, 2024

*_/s/ Nicholas D. Thompson_*
Nicholas D. Thompson
Casey Jones Law
525 Junction Road, Ste 6500
Madison, WI 53717
Phone: (757) 477-0991
nthompson@caseyjones.law

Kathryn E. Averwater
*Admitted Pro Hac Vice*
Casey Jones Law
323 N Washington Ave, Ste 200
Minneapolis, MN 55401
Phone: (612) 293-5249
kaverwater@caseyjones.law