IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTOPHER SNYDER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 3:23-cv-59 |
| ) | Judge Stephanie L. Haines |
| NORFOLK SOUTHERN RAILWAY CO., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Pending before the Court is a Motion for Summary Judgment (ECF No. 32) filed by Defendant, Norfolk Southern Railway Co. ("Norfolk"). Norfolk seeks to dismiss Plaintiff, Christopher Snyder's Complaint (ECF No. 1) in civil action. Snyder's one-count Complaint alleges that Norfolk discriminated against him when it didn't return him to work because of his qualified disability, even though Snyder's doctors cleared him for work. Snyder brings this action under 42 U.S.C. § 12112, *et seq.* of the Americans with Disabilities Act ("ADA") and seeks compensation for loss of income, emotional distress, and other damages.

I.   **Introduction**

   A.   **Procedural History**

On April 4, 2023, Snyder filed the Complaint (ECF No. 1) against Norfolk, and Norfolk answered the Complaint (ECF No. 15). A Case Management Conference was set (ECF No. 17) and later held on July 14, 2023 (ECF No. 20). The Court issued an Initial Scheduling Order (ECF No. 21) providing a time frame for discovery. On October 18, 2023, the Parties participated in

1

mediation and failed to reach a settlement (ECF No. 26).[1]  Subsequently, the Parties filed a proposed pretrial order (ECF No. 28), and a post-discovery telephone conference was held (ECF No. 30).  The Court issued a Final Scheduling Order (ECF NO. 31) with directives leading to a trial scheduled for August 26, 2024.  On April 15, 2024, Norfolk filed its Motion for Summary Judgment (ECF No. 32), a Concise Statement of Material Facts ("CSMF") (ECF No. 33), and a supporting Brief (ECF No. 34).  Snyder filed a Response in Opposition (ECF No. 36), a CSMF (ECF No. 37), and later a Response to Norfolk's CSMF (ECF No. 38).  Norfolk filed a Reply Brief (ECF No. 41).  The Motion for Summary Judgment is ripe for disposition and the trial dates have been stayed (ECF No. 42) pending the Court's resolution of this matter.

**B.     Factual Background**[2]

Snyder had been employed with Norfolk as an electrician for nearly twenty years at the inception of this case. ECF No. 33, ¶ 3.  He works at Norfolk's Locomotive Shop in Altoona, Pennsylvania which is one of the largest facilities in the industry and spans 70 acres. *Id.* ¶ 4.  In his role as an electrician for Norfolk his duties could include electrical diagnostics, rebuild, and repair. *Id.* ¶ 6; *see also* ECF No. 33-4 (Norfolk Electrician Job Description).  Electricians work on high voltage locomotive engines and are tasked with climbing in, on and off 10-15-foot-high locomotives, sometimes outside the shop in inclement weather conditions. *Id.* ¶ 8.  Electricians must also be able to operate and move locomotive engines into bays. *Id.* ¶ 9.  Norfolk considers the position of Locomotive Shop electrician a safety-sensitive position. *Id.* ¶ 7.  Snyder disputes that a global description of a Norfolk electrician pertains to him.  Snyder states that his particular job did not require him to work at heights without fall protection gear, did not require him to work with live wires, and did not require him to work around moving locomotives. ECF No. 35, ¶¶ 13,

---

[1] Norfolk also docketed a Notice of Offer of Judgment (ECF No. 27) which did not result in settlement.
[2] The facts set forth derive from the Parties' CSMFs and are undisputed unless otherwise noted.

14. Snyder also states he could be accommodated where he didn't need to drive locomotives into the bay. ECF No. 33, ¶ 47. The Court notes that Norfolk's job description of electrician states, "Norfolk Southern does not have a formalized job analysis for the essential functions of an Electrician... job tasks may vary depending on the actual assignment and location." ECF No. 33-4, p. 2.

Snyder first suffered a seizure on or about November 11, 2005. ECF No. 33, ¶ 16. At that time, he started taking seizure control medication. *Id.* ¶ 16. Snyder states that neither he nor his doctors knew he had, in fact, suffered a seizure at that time. ECF No. 35, ¶ 16. Snyder did not disclose his seizure disorder to Norfolk until March 2016. ECF No. 33, ¶ 18. In March 2016, Snyder suffered a series of seizures and periods of "fogginess," "momentary mental slowness," "confusion," "slowed mentation," and "weakness." *Id.* ¶ 20. Snyder was hospitalized from March 16, 2016, to March 25, 2016, and ultimately was sedated and intubated. *Id.* ¶ 21. Snyder notified Norfolk that he would need to take a leave of absence on March 16, 2016. *Id.* ¶ 22. On March 28, 2016, Norfolk Southern Health Services ("NSHS") sent a letter to Snyder confirming his leave and notifying him that before he could return to work NSHS would need "additional medical information to determine [his] fitness for service as an electrician." *Id.* ¶ 23. The materials requested included a written statement from his medical provider addressing his risk of experiencing a recurrent seizure within the next six months to one year. *Id.* On June 27, 2016, NSHS sent Snyder another letter stating he was not fit for duty. *Id.* ¶ 24; ECF No. 33-10. In this letter it says:

> Upon careful review of records, essential job functions and all reasonable accommodation, it has been regretfully determined that you are currently not fit for duty for a safety-sensitive job as an Electrician due to your Seizure Disorder for the following reason(s):

> NS Medical Department guidelines for an Electrician with a Seizure Disorder require documentation of control and stability, including a minimum seizure free period of 6 months since the date of your last seizure while on a stable medication regimen or a minimum seizure free period of 6 months since the date of the last seizure while off medication.

ECF No. 33-10, p. 2. In this same letter, Snyder was offered the option of being considered for a vacant position in Vocational Rehabilitation Services ("VRS"). Snyder did not contact VRS and claims that accepting a position with VRS would not have been in his best interest because he would have lost his seniority and all the benefits that come with seniority as well as it would have caused him to be furloughed. ECF No. 35, ¶¶ 25, 26.

On October 3, 2016, NSHS requested updated medical information for Snyder's fitness to return to work. ECF No. 33, ¶ 28. Snyder acknowledges and concedes he could not return to work from March 16, 2016, through January 27, 2017. ECF Nos. 33, ¶ 29; 35, ¶ 29. An MRI revealed that Snyder's brain had at least five "cavernous malformations" and brain surgery was necessary to remove two of the malformations to improve Snyder's risk of seizures. ECF No. 33, ¶ 31. The surgery was performed on January 24, 2017. *Id.* ¶ 32. Snyder followed up with the surgeon on February 8, 2017, and it was recommended that Snyder continue with his current seizure control medications Keppra and Depakote. *Id.* ¶ 33. The post-operative notes state that Snyder had been seizure free since the surgery and "[f]rom a surgical standpoint, he may return to work without restriction 2 months from his surgery date. He has a follow up appointment with neurologist Dr. Clark on 3/20/2017 and epileptologist Dr. Urban on 3/29/17. We would like him to repeat a brain MRI… in about 1 year." ECF No. 33-15, p. 2; ECF Nos. 33, ¶¶ 34, 35; 35, ¶¶ 34, 35. On March 29, 2017, the epileptologist tapered off the Depakote but told Snyder he would likely be on seizure control medication for the rest of his life. ECF No. 33, ¶ 36.

Norfolk states that Snyder's doctors were unaware of the safety-sensitive nature of his job requirements. ECF No. 33, ¶¶ 37, 38. Snyder disputes this stating that he advised his doctors that he worked for the railroad as an electrician and advised them of his job duties. ECF No. 35, ¶ 37. He also disputes that there was any printed job description that he could provide to the doctors. *Id.* ¶ 38.

On April 13, 2017, NSHS sent Snyder a letter advising him that the Medical Director, Dr. Francesca Litow, had received and reviewed his medical records up to March 29, 2017. ECF No. 33, ¶ 40; ECF No. 33-17. Dr. Litow writes, "Upon careful review of records, essential job functions and all reasonable accommodation, it has been regretfully determined that you are currently not medically cleared to return to your current safety-sensitive position of Electrician performing the essential job functions of work at heights and operation locomotives due to your seizure disorder." ECF No. 33-17, p. 2; ECF No. 33, ¶ 45. Dr. Litow goes on to request certain records going forward from July 3, 2017, to December 31, 2017. *Id.* The letter further states, "[U]ntil you provide documentation that you have not had a seizure for 1 year (dating from your surgery in January 2017), you will not be medically cleared to work at heights. Until you provide documentation that you have not had a seizure for 10 years (dating from your surgery in January 2017) you will not be medically cleared to operate locomotives."[3] ECF No. 33-17, p. 2.

Snyder disputes that Norfolk engaged in careful review. ECF No. 35, ¶ 45. He states that Norfolk does not provide any basis for the need for further restriction or that he could not have been accommodated. He says Dr. Litow did not cite to any medical evidence, nor offer the opinion

---

[3] Norfolk says the July 17, 2017, letter contained the statement that it could not complete a full assessment without medical documentation showing control and stability of his seizure disorder for six months following his brain surgery "*while on a stable medication regimen[.]*" ECF No. 33, ¶ 42. Snyder disputes this statement. ECF No. 35, ¶ 42. The Court finds the letter (ECF No. 33-17) did not have the language Norfolk cited. This letter is marked as Exhibit 16 according to the docket, but its sticker label reads Exhibit 9.

5

of any medical expert. *Id.* Snyder adds that at the time that Dr. Litow issued the July 17, 2017, letter he had been cleared to return to work without any restrictions by three relevant specialists (his surgeon, neurologist, and epileptologist). *Id.* On July 25, 2017, a fourth family practice doctor, Dr. Delozier, wrote,

> I am writing this letter to corroborate this opinion. Mr. Snyder is completely stable medically. He has no concerning behaviors, actions, nor cognitive impairment. He wants to return to work. He is being told that he cannot which I find to be not only unfortunate but unfair and unjust. Please reconsider your position on this pleasant gentleman who wants nothing more than to return to work and support himself and his family.

*Id.*; ECF No. 35-9, p. 2. Finally, Snyder states that his particular role as electrician did not require him to work at heights without fall protection gear and he could be accommodated for driving locomotives. ECF No. 35, ¶ 45. Norfolk states Snyder never asked to be accommodated. ECF No. 33, ¶ 52. Snyder disputes this on two bases: First he did not believe he needed restrictions, and second Norfolk's letter pre-emptively stated they could not accommodate him. ECF No. 35, ¶ 52.

On January 9, 2018, Snyder's neurologist sent NSHS a letter that Snyder's last seizure was in March 2016, and that he was on a stable dosage of seizure control medication and that in the neurologist's opinion Snyder could return to work. ECF No. 33, ¶ 54; ECF No. 33-20, p. 3. Snyder states that his condition had been stable since March 2017 and that the only change was he filed an Equal Employment Opportunity Claim on December 14, 2017. ECF Nos. 35, ¶ 54, 35-10. The neurologist's letter is dated January 9, 2018, about a year after Snyder's surgery on January 27, 2017. Snyder returned to work on February 1, 2018. ECF No. 33, ¶ 55.

As part of the facts, Norfolk states that Snyder received wages from January 15, 2018, through February 1, 2018, because the International Brotherhood of Electrical Workers ("IBEW") submitted a grievance on Snyder's behalf. ECF No. 33, ¶¶ 57, 58. Norfolk also states that Snyder

6

received sickness and unemployment benefits from the Railroad Retirement Board ("RRB") for the entire period he was not working. ECF No. 33, ¶ 63. He received benefits for "Total Disability" beginning March 15, 2017, until April 5, 2017. *Id.* ¶ 64. Snyder's response to such statements is that these facts are not reducible to admissible evidence. ECF No. 35, ¶¶ 58-63.

### III. Standard of Review

In relevant part, Rule 56 provides:

A party may move for summary judgment, identifying each claim or defense...on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by...citing to particular parts of materials in the record...or...showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(a), (c).

After discovery and upon a motion, Rule 56 requires the entry of summary judgment against a party who "'fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.'" *Marten v. Godwin,* 499 F.3d 290, 295 (3d Cir. 2007) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)). An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could decide it for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.,* 480 F.3d 252, 256 (3d Cir. 2007) (citing *Anderson,* 477 U.S. at 248; *Celotex Corp.,*

477 U.S. at 322-23)).

Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *See Celotex,* 477 U.S. at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *See Williams v. Borough of W. Chester,* 891 F.2d 458, 460 (3d Cir. 1989). However, in deciding a Rule 56 summary judgment motion, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences and resolve all doubts in its favor. *See Woodside v. Sch. Dist. of Phila. Bd. of Educ.,* 248 F.3d 129, 130 (3d Cir. 2001); *Santini v. Fuentes,* 795 F.3d 410, 416 (3d Cir. 2015) (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). The benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *See Bialko v. Quaker Oats Co.,* 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.,* 44 F.3d 195, 200 (3d Cir. 1995)).

IV.    **Analysis**

Snyder brings this case under the Americans with Disabilities Act ("ADA") alleging that Norfolk discriminated against him by unreasonably delaying his return to work because of his seizure disorder. The ADA prohibits an employer from discriminating against a "qualified individual" with a disability. 42 U.S.C. § 12112. "To establish a prima facie ADA discrimination case, a plaintiff must prove that [he] (1) is disabled within the meaning of the ADA, (2) is a qualified individual, and (3) has suffered an adverse employment action because of [his] disability. Under the ADA, a qualified individual can perform the essential functions of the position with or

without reasonable accommodation." *Emmell v. Phoenixville Hosp. Co., LLC*, 303 F. Supp. 3d 314, 328 (E.D. Pa. 2018) (internal citations and quotations omitted). Norfolk states that Snyder cannot establish the prima facie case of discrimination because he is not a qualified individual who can perform the essential functions of the job with or without accommodation and he has suffered no adverse employment action. ECF No. 34, p. 11. Norfolk furthers its argument to say that even if Snyder could establish a prima facie case of disability discrimination, there is no evidence of pretext to cast doubt on Norfolk's legitimate nondiscriminatory reason to extend Snyder's health-related absence until he could be found fit for service for his role as an electrician. *Id.* at 11-12. The issue in controversy is whether Snyder suffered an adverse employment action when Norfolk delayed his return to work or did Norfolk have a legitimate, non-discriminatory reason for finding Snyder unfit to return to his job as an electrician.

Norfolk states that Snyder's position as an electrician is deemed a "safety sensitive" position in the company. ECF No. 34, p. 12. The Federal Railroad Administration ("FRA") considers certain railroad positions to be "safety-sensitive" because performance in those positions implicates the safety of both the public and fellow railroad workers. *Id.* Norfolk posits that it must take this into account when determining an employee's fitness for duty and whether the employee would pose a "direct threat" or "significant risk" to health or safety. *Id.* at 13.

Norfolk issued its directive that Snyder must remain seizure-free and on a stable medication regimen for a time-period before reinstating him. That said, it appears that Norfolk sent several letters requiring different parameters for return to work such as two different time-periods of either 6 months or one year, and at times asking for a stable medical regimen and other times not. ECF No. 1, ¶¶ 15-16. First, in a letter dated March 28, 2016, Norfolk requested information pertaining to Snyder's seizures including, "risk of experiencing a recurrent seizure within the next 6 months

9

to one year." ECF No. 33-9, p. 2. Norfolk requested this information to help determine Snyder's "ability to return to work safely and to help [Snyder] get back to work as quickly as possible." *Id*. Norfolk sent a second letter on June 27, 2016, specifying that it had received medical records through March 22, 2016, and determined Snyder was not fit to return to work. ECF no. 33-10, p. 2. Norfolk requested medical records going forward and stated, "NS Medical Department guidelines for an Electrician with a Seizure Disorder require documentation of control and stability, including minimum seizure free period of *6 months since the date of the last seizure while on a stable medication regimen* or *a minimum seizure free period of 6 months since the date of the last seizure while off seizure medication*." *Id*. Norfolk sent a third letter on October 3, 2016, asking for additional medical information to determine Snyder's fitness for duty. Then on July 17, 2017, Norfolk sent a letter with a determination that said it "regretfully determined that [Snyder was] not medically cleared to return to [his] current safety-sensitive position of Electrician performing the essential job function of work at heights and operation of locomotives due to [his] seizure disorder." ECF No. 33-17, p. 2. It also stated, "[U]ntil you provide documentation that you have not had a seizure **for 1 year (dating from your surgery in January 2017)**, you will not be medically cleared to work at heights. Until you provide documentation that you have not had a seizure for 10 years (dating from your surgery in January 2017) you will not be medically cleared to operate locomotives." *Id*.

Snyder asserts that multiple doctors cleared him to return to work. *See* ECF Nos. 33-18 (July 17, 2017, with height and operating locomotives)[4]; 33-20 (January 9, 2018, stable on medication); 35-7 (March 20, 2017, can work full-time without restrictions); 35-8 (April 24, 2017, return full time without restrictions); 35-9 (July 25, 2017, completely medically stable). He states,

---

[4] Norfolk responded that it could not accommodate the restrictions. ECF No. 33-19.

10

Norfolk's doctor, Dr. Litow, discounted sound medical advice and did not base the determination of "unfit" on any substantive medical evaluation. Norfolk retorts that the doctors clearing Snyder for duty were unaware of the "safety sensitive" nature of Snyder's work and were therefore not fully informed to make proper conclusions of his fitness for work. Norfolk also points to the undisputed medical facts relied upon by Dr. Litow. *See* ECF No. 41, pp. 3-4.

Norfolk provides a litany of case law to support its decision to delay Snyder's return to work. The supporting caselaw uses a test for determining whether an employee can be reasonably accommodated for a direct threat. "[A]n employer must consider (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm." ECF No. 34, p. 13 (citing 29 C.F.R. § 1603.2 EEOC Regulations); *see also* ECF No. 34, pp. 14-15. Norfolk argues it is entitled to "'determine how much risk is too great for it to be willing to take' when establishing and adhering to its guidelines requiring Plaintiff to show minimum seizure-free periods while on a stable medication regimen and following his brain surgery." ECF No. 41, p. 5 (citing *Anderson v. Norfolk S. Ry. Co.*, No. 21-1735, 2022 WL 1073581, at *3 (3d Cr. Apr. 11, 2022) (quoting *EEOC v. Schneider Nat., Inc.*, 481 F.3d 507, 510 (7th Cir. 2007)).

Snyder agrees that a direct threat analysis applies but argues that Norfolk has not met its burden of proof. ECF No. 36, p. 13. While a direct threat analysis is instructive, especially as it applies to the ADA,[5] it is not useful to the Court while genuine issues of material fact are outstanding. In other words, risk and harm cannot be determined without a factual determination

---

[5] "The direct threat exception allows discrimination if a disability 'poses a direct threat to the health and safety of others,' that cannot be eliminated by a modification of policies, practices, or procedures, or with the provision of additional aides or services." ECF No. 36, p. 13 (quoting *EEOC v. Hussey Copper Ltd.*, 696 F. Supp. 2d 505, 519 (W.D. Pa. 2010) (citing 28 C.F.R. Part 35, App. A at 483)).

of whether the medical advice received was fully informed and a date certain when Snyder achieved fitness for duty under Norfolk's mandates.[6]

The Court finds there is a multitude of genuine issues of material fact that are crucial for a determination of whether Norfolk acted in violation of the ADA when postponing Snyder's return to work. The facts indicate that Snyder did not have a seizure since March 2016, before the operation was performed on January 24, 2017; when was Snyder medically determined to be seizure free? It was stated that Snyder's medication regimen was stabilized in and around March 29, 2017; when was Snyder medically determined to be stable? Were Snyder and Norfolk's doctors fully informed when recommending Snyder return or not return to work? Indeed, Norfolk's correspondence is muddled in its requirements for Snyder to return to work. It is necessary to know Norfolk's written policy as it pertains to an electrician with a seizure disorder. Furthermore, is this policy applied evenly to all electricians even though their duties vary?

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could decide it for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A fact is 'material' if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit." *Armano v. Martin,* 157 F. Supp. 3d 392, 400 (D.N.J. 2016), *aff'd,* 703 F. App'x 111 (3d Cir. 2017) (quoting *Anderson,* 477 U.S. at 248). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Id.* (quoting *Marino v. Industrial Crating Co.,* 358 F.3d 241, 247 (3d Cir.2004). Given the factual uncertainty of when Snyder attained "stability" and given the uncertainty of Norfolk's policy on return to work for an electrician with

---

[6] It also follows that an analysis of a violation of the ADA would be futile as the Court could not determine whether Snyder suffered an adverse employment action and if so, to what extent.

the specific duties assigned to Snyder, there are genuine issues of material fact for the fact-finder's determination.

IV.     **Conclusion**

Viewing the facts in the light most favorable to Plaintiff as the nonmoving party and drawing all reasonable inferences and resolving all doubts in Plaintiff's favor, the Court finds that a genuine issue of material fact exists as to whether Norfolk was justified in delaying Snyder's return to work and the proper calculation to determine when Snyder was eligible to return to work. The existence of genuine issues of material facts preclude judgment as a matter of law for Defendant. The Motion for Summary Judgment is, therefore, DENIED.

Dated: March 14, 2025

_____
Stephanie L. Haines
United States District Judge